UNITED STATES COURT DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RICHARD BERGER, for himself and on behalf of all others similarly situated,

        Plaintiffs,

  against

NEW YORK UNIVERSITY,

        Defendants.

Civ. No. 19-CV-00267 (JPO)

---

## DECLARATION OF SHANELLE PENDERGRASS

SHANELLE PENDERGRASS hereby declares as follows:

1. I am currently employed by New York University ("NYU") as its Director of Support Services in its Department of Public Safety. This declaration, which is submitted in support of NYU's opposition to Plaintiff Richard Berger's Motion to Remand in the above-captioned action, is based on my personal knowledge unless otherwise indicated.

2. I have been employed by NYU in its Department of Public Safety continuously since 2008 and have held the title of Director, Support Services since in or about 2018. Prior to this role, I held numerous other positions in NYU's Department of Public Safety, including: (i) Director, Uniformed Services from 2017 to 2018, (ii) Captain from 2017 to 2017; (iii) Lieutenant from 2014 to 2017; (iv) Sergeant from 2009 to 2014; and (v) Officer from 2008 to 2009. During the period of time in which I was an Officer, I was a member of Local One Securities Officers Union (the "Union").

3. As a result of my various roles at NYU, I am very familiar with the collective bargaining agreements that have existed, and currently exist, between NYU and the Union (the "CBA"), that governs the terms and conditions of the Union members' employment, and am also

familiar the parties' course of conduct with respect to the CBA. Among other reasons, this is because in my different roles, I have had supervisory responsibilities over officers and payroll procedures, and am familiar with what constitutes working time and how compensation is paid and calculated under the CBA and the parties' historical course of dealings regarding same.

4. For instance, I am familiar with both the start- and end-shift procedures for NYU's security officers. The CBA provides that the first fifteen minutes of each shift will be used for "the purpose of roll call." (CBA, Art. 5(A), (I).)

5. Pursuant to the CBA and the historical practice and course of dealing between the Union and NYU, this 15-minute period begins immediately before the start of a Union member's scheduled shift, which shifts are staggered as follows: (i) 7:00 a.m. through 3:00 p.m.; (ii) 3:00 p.m. though 11:00 p.m.; and (iii) 11:00 p.m. through 7:00 a.m. For instance, the 15-minute "roll call" period preceding the 11:00 p.m. shift begins at 10:45 pm.

6. Union members are paid for the entire 15-minute "roll call" period, as well as the time during the scheduled shift and, as explained below, the 15-minute period immediately following their scheduled shift (less a thirty minute unpaid meal break in the middle).

7. As background, officers are assigned to one of several different locker rooms, which assignment is based on proximity to their normal assigned location. As a result, the pre-shift 15-minute "roll call" period involves the following: (i) Union members travel from their designated locker room to their assigned roll call; (ii) roll call is conducted, which typically takes five minutes; and (iii) Union members travel to their assigned post, the location of which differs from Union Member to Union Member – some are assigned to the building in which roll call is held, some are assigned to buildings nearby, and some are assigned to "patrol" (*i.e.*, patrolling the streets).

8. The process of traveling to roll call differs based on the location of the Union Member's assigned locker room. Some officers have roll call in the same building as their locker room, while others may need to walk to a different building. Given this, the 15-minute "roll call" period incorporates in paid travel time, which is consistent with the CBA and the parties' practice and course of dealing. For instance, the CBA expressly provides that all officers whose locker room is located at a building on Washington Place – like Plaintiff – have a paid "two-minute grace period" from the start of the "roll call" period during which they can travel to roll call (this travel involves crossing a single street). (CBA, Art. 5(I).) Since September 2018, and as agreed to by the Union, the grace period for these officers is now eight minutes, because the "roll call" location has changed to a building that is further away from the locker room, but officers are still paid starting for the entire time period starting 15 minutes prior to their shift.

9. Until recently, Plaintiff was assigned to the same building in which his roll call was held, and thus after roll call, he only needed to travel within the same building to arrive at his post. (As of September 2018, the roll call location was moved to a different building, but Berger's assignment stayed the same.)

10. In advance of the 15-minute "roll call" period, Union members typically go to their assigned locker room and change into their uniforms. These uniforms consist of a shirt, pants and shoes (and occasionally a jacket), but do not include any safety equipment. Further, officers are not provided with any weapons or other safety or specialized equipment.

11. In accordance with the CBA, and decades-long custom and practice, time spent putting on uniforms is not paid working time. To the best of my knowledge, neither the Union nor any Union member has ever challenged this practice, whether through the grievance procedure or otherwise (other than the present lawsuit).

12. At the end of each officer's scheduled shifts, the CBA provides that Union members "will not be required to perform any duties during the last fifteen (15) minutes of their shift, but will be permitted to return to the locker room to change their clothes and return equipment." (CBA, Art. 5(I).) This 15-minute period begins immediately after the Union members' scheduled shift time. For example, if a Union member's shift ends at 7:00 a.m., that officer will be paid – but need not perform any duties – from 7:00 a.m. through 7:15 a.m.

13. On occasion, officers may be required to work beyond the end of their scheduled shift and into the 15-minute end-of-shift period. This can happen if, for example, a replacement is running late or certain administrative tasks need to be addressed.

14. If this occurs, it has long been the practice and custom that the officer who needs to stay late will be paid at a daily overtime premium rate for this additional time. Officers indicate they are entitled to overtime by submitting an "overtime slip" to NYU reflecting that they had worked overtime; this process has been in place for at least a decade.

15. End-of-shift procedures differ based on the nature of an officer's assignment. For officers assigned to academic buildings (like Berger), they need only wait for their replacement, but can leave upon their arrival. Officers on patrol (*i.e.*, who are not assigned to a specific building) can just return to the locker room, and often do so at the very end of their shift (*i.e.*, prior to or at the start of the 15-minute period).

16. Officers assigned to dormitories, however, generally need to wait for a replacement and then conduct certain administrative tasks before leaving their post. Because this often extends into the 15-minute period, the CBA presumptively awards these residential officers daily overtime premium compensation, referred to as an "overtime credit," the amount of which is dependent on the building to which an officer is assigned. (CBA, Art. 14(h).) The overtime

4

credit is paid regardless if these officers work this additional time or not, and results from a longstanding practice – as noted in the CBA, these credits have carried forward from prior to 1997.

I declare under penalty of perjury under the laws of the State of New York and the United States that the foregoing is true and correct.

Signature: *Shanelle Pendergrass*

Printed Name: Shanelle Pendergrass

Date: 3/6/299